LOUIS ROSENSTEIN, Respondent, *v.* HENRY VOGEMANN et al., Appellants.

1. CHARTER PARTY — WHEN CHARTERERS, NOT OWNERS, ARE LIABLE FOR LOSS OF GOODS RESULTING FROM ALLEGED NEGLIGENCE IN UNLOADING GOODS. Where a charter party gives to the charterers of a steamship the absolute right of selecting the dock, wharf or place for the discharge of the cargo with which the steamship is laden, provided only that the steamer shall always lie safely afloat at any tide, the charterers to indemnify the owner from all consequences or liabilities that might arise from the signing of bills of lading, the owner is not liable for the value of goods destroyed by the collapse of a pier as the result of the alleged negligence of the charterers in failing to exercise reasonable care and diligence in selecting a suitable place in which to unload and deposit the goods.

2. COMMON-LAW RULE AS TO NOTICE TO CONSIGNEE — WHEN IT IS NOT AVOIDED BY PROVISIONS OF BILL OF LADING. The common-law rule that where the contract is to carry goods by water from port to port, the carrier is liable until the goods have been actually delivered or notice of the time and place of arrival of the vessel given to the consignee and a reasonable time thereafter allowed for the removal of the goods, is not avoided by a provision in a bill of lading, " Goods to be taken from the ship by the consignee directly they come to hand in discharging the ship and the carrier's responsibility to cease package by package immediately the goods leave the ship's deck or tackle. If not taken from alongside by the consignee they will be landed and deposited at the expense of the consignee and at his risk of fire, loss or injury on the dock or in the warehouse or in craft," where the bill of lading is silent upon the question of notice; since in so far as the contract is ambiguous or leaves the intention of the parties in doubt, it must be construed against the carrier.

3. WHEN NOTICE TO CONSIGNEE IS INSUFFICIENT — LIABILITY OF CAR-
RIER FOR LOSS OF GOODS CAUSED BY COLLAPSE OF PIER.  Where it
appears, in an action brought for the value of goods carried under such
bill of lading from a foreign port to a consignee in the city of New York
and destroyed by the collapse of a pier upon which they were unloaded,
that they were transported by a freight steamship having no pier or dock
of her own, and no schedule or fixed time of arrival, so that the con-
signee could not estimate or determine with reasonable certainty the day
on which she would arrive or at what pier or wharf she would find a
berth; that the steamship was berthed at a Staten Island pier about noon
of a certain day; that the consignee received notice of that fact from the
owners of the pier between two and three o'clock of the same day; that
the unloading of the goods was concluded on the following day, they
being placed upon the pier, and that at about five o'clock of that day
the pier collapsed and the goods were precipitated into the water and
thereby rendered valueless, the evidence justifies a finding that sufficient
notice of the arrival of the steamship, and reasonable time to appear at
the pier and take charge of the freight, was not given to the consignee,
so that the carriers were not relieved, under the circumstances, of their
liability as common carriers by a discharge of the goods upon the pier;
and such liability is not dependent upon the question whether they were
guilty of negligence in having failed to exercise reasonable care in select-
ing a safe place to unload.

*Rosenstein* v. *Vogemann*, 102 App. Div. 39, affirmed.

(Argued March 6, 1906; decided March 20, 1906.)

APPEAL from a judgment of the Appellate Division of the
Supreme Court in the second judicial department, entered
February 28, 1905, affirming a judgment in favor of plaintiff
entered upon a verdict directed by the court.

The nature of the action and the facts, so far as material,
are stated in the opinion.

*John Notman* and *Wilhelmus Mynderse* for appellants.
Under the provisions of the bill of lading contract, under
which the goods were received and shipped, the carriers' lia-
bility, as such, ceased upon the arrival of the ship and the
discharge of the cargo, package by package, immediately the
goods left the ship's deck or tackle.  (*Constable* v. *Nat. S. S.
Co.*, 154 U. S. 51; *Dorr* v. *N. J. S. N. Co.*, 11 N. Y. 485;
*Bissell* v. *N. Y. C. R. R. Co.*, 25 N. Y. 442; *Steinway* v.

*E. R. R. Co.*, 43 N. Y. 123; *Park* v. *Preston*, 108 N. Y. 434; *Mynard* v. *S. R. R. Co.*, 71 N. Y. 180.) The carriers were in no event liable for goods discharged over the ship's side and deposited on the wharf other than as warehousemen. (*Collins* v. *Burns*, 63 N. Y. 1; *Tarbell* v. *R. E. S. Co.*, 110 N. Y. 170; *Gleadell* v. *Thompson*, 56 N. Y. 194.) The defendants were not common carriers, but simply under the charter party and bill of lading made a contract, as agents for the master, between the owner of the steamer and plaintiff's assignor, for the transportation of this shipment from Hamburg to New York. (*Freeman* v. *Buckingham*, 18 How. [U. S.] 182; *The New York*, 93 Fed. Rep. 495; *The Maggie Hammond*, 9 Wall. 435; *Robinson* v. *Chittenden*, 69 N. Y. 525; *Hooe & Co.* v. *Groverman*, 1 Cranch, 214; *Reid* v. *U. S.*, 11 Wall. 591; *The Nicaragua*, 71 Fed. Rep. 723; *Fenton* v. *Dublin Steam Packet*, 8 A. & E. 835; *Manchester* v. *Furness, Withy & Co.*, L. R. [2 Q. B. 1895] 282; *The Sprott*, 70 Fed. Rep. 327.)

*H. Aplington* and *Charles R. Barge* for respondent. The defendants' liability as common carriers continued until after the arrival of the vessel and a reasonable time for the consignees to remove the goods. (*McAndrews* v. *Whitlock*, 52 N. Y. 40; *Tarbell* v. *R. E. S. Co.*, 110 N. Y. 170; *Brand* v. *N. J. S. Co.*, 10 Misc. Rep. 128; *McKinney* v. *Jewett*, 90 N. Y. 267; *K. Co.* v. *Murray*, 90 Hun, 554.) A reasonable time to remove the goods in question had not elapsed after the unloading of the steamer, and, therefore, the liability of the defendants as common carriers was not transformed into a liability as warehousemen. (*Dunham* v. *R. R. Co.*, 46 Hun, 245; *Wood* v. *Crocker*, 18 Wis. 345; *Parker* v. *Ry. Co.*, 30 Wis. 689; 5 Am. & Eng. Ency. of Law [2d ed.], 270; *Hedges* v. *R. R. Co.*, 49 N. Y. 223; *R. R. Co.* v. *Hatch*, 52 Ohio St. 408.) The defendants are the proper parties defendant in this action. (*Springer* v. *Westcott Co.*, 166 N. Y. 117; *De Renner* v. *Brown*, 165 N. Y. 410; *McClure* v. *Trust Company*, 165 N. Y. 108; *Leary* v. *U. S.*, 14 Wall. 607.)

The defendants can establish no exemption from liability under the provisions of the bill of lading. (*Tarbell* v. *R. E. S. Co.*, 110 N. Y. 170; *Gleadell* v. *Thompson*, 56 N. Y. 194; *Grand* v. *Livingston*, 4 App. Div. 589; *The Titania*, 131 Fed. Rep. 229.)

HAIGHT, J. This action was brought to recover of the defendants, as common carriers, the value of seven hundred bags of hemp seed shipped on board the steamer *Louise* from the port of Hamburg in Germany to the plaintiff's assignor in New York. The vessel arrived at New York on the 8th day of May, 1901, and was berthed at pier four, American Dock Stores, at Staten Island, at about twelve o'clock noon of that day. There is some question as to the notice given to the plaintiff's assignor of the arrival of the vessel, but it is admitted by the plaintiff that notice was received from the owners of the dock of the arrival of the vessel between two and three o'clock of that day. It appears that the unloading of the hemp seed was concluded on the day following; that the same was placed on the pier and that at about five o'clock of that day the pier collapsed and the seed was precipitated into the water and rendered valueless.

The complaint alleged two causes of action. It first alleged a violation of the defendants' contract as a common carrier, by reason of their failure to deliver the goods; and the second charged negligence in having failed to exercise reasonable care and diligence in selecting a suitable place in which to deposit the seed.

The answer put in issue the allegations of the complaint and denied that the defendants had such ownership or interest in the vessel as would render them liable as common carriers, claiming that they acted merely as agents of the owners of the steamer, and further alleged that the contract, as contained in the bill of lading, had been fully performed by them. At the close of the evidence both parties moved that a verdict be directed in their favor, and thereupon the court decided in favor of the plaintiff, to which an exception was taken by the

defendants. There was no motion made on their behalf to
submit any question of fact to the jury. It, therefore, follows
that the trial judge was authorized to determine all questions
of fact which were involved in the case. The trial court,
however, in directing a verdict for the plaintiff, remarked,
with reference to the plaintiff's contention, that the doctrine
of *res ipsa loquitur* applied as to the collapse of the dock,
had been fully rebutted by the evidence given upon the trial,
and that he directed a verdict for the plaintiff upon the other
questions in the case.

The defendants were doing business as co-partners under
the firm name of "H. Vogemann," consisting of H. Voge-
mann, Sr., H. Vogemann, Jr., and John H. Gans. The
owner of the steamship *Louise* was Carl Hirshberg, and the
bill of lading was executed by the senior member of the firm
in Hamburg, Germany, on the 21st day of April, 1901, "For
the captain, H. Vogemann." The charter party was executed
in the city of New York on the 25th day of April, 1900,
between the agents of the owner and the Hudspeth Trans-
atlantic Line, as charterers, of the city of Richmond, Virginia.
By it the owners agreed to let, and the charterers agreed to
hire, the steamship from the time of delivery for a period of
twelve calendar months. The cargoes were to be laden and
discharged "in any dock or at any wharf or place that the
charterers or their agents may direct, provided the steamer
can always safely lie afloat at any time of tide." It was also
provided in the charter party that the captain (although
appointed by the owners) shall be under the orders and direc-
tions of the charterers as regards employment, agency or
other arrangements, and the charterers hereby agree to indem-
nify the owners from all consequences or liabilities that may
arise from the captain's signing bills of lading or otherwise
complying with the same; and also that, in the event of loss
from any accident to the cargo by detention or loss of time,
the same shall be at the charterers' risk and expense. The
charter party was assigned to the defendants on August 20th,
1900.

The fact that the charter party gives the charterers the absolute right of selecting the dock, wharf or place for the discharge of the cargoes with which the vessel is laden, provided only that the steamer shall always lie safely afloat at any tide, and the further provision that the charterers agree to indemnify the owner from all consequences or liabilities that may arise from the signing of bills of lading, in our opinion is an answer to the contention of the defendants that the owner of the vessel was liable in their stead for the damages resulting to the plaintiff. (*Auten* v. *Bennett,* 183 N. Y. 496, and authorities there cited.)

We are thus brought to a consideration of the question as to whether the defendants are liable, under the circumstances of this case, as common carriers. It appears to be conceded that the rule of the common law is that, where the contract is to carry goods by water, from port to port, the carrier retains his character as such, with the attendant liability as insurer, until the goods have been delivered to the consignee, either actually or constructively, and that to constitute a constructive delivery there must be a notice of the arrival of the vessel at the place of docking, and a reasonable time thereafter given for the removal of the goods by the consignee, and that in case of his failure to appear and take charge of the goods the carrier may place them in a place of safety for storage, giving notice thereof and thus be relieved from further liability with reference thereto. (*The Eddy,* 5 Wall. 481, 495.) It is contended, however, in this case that the rule of the common law had been changed by the agreement of the parties as incorporated in the bill of lading. It is as follows: " Goods to be taken from the ship by the consignee directly they come to hand in discharging the ship and the carrier's responsibility to cease package by package immediately the goods leave the ship's deck or tackle. If not taken from alongside by the consignee they will be landed and deposited at the expense of the consignee and at his risk of fire, loss or injury on the dock or in the warehouse or in craft." As to this provision of the contract it is contended on behalf of the defendants that no notice

of the arrival and docking of the vessel was required to be
given as a condition precedent of their right to unload upon
the dock, and that after they had unloaded upon the dock
their liability as a carrier became so modified as to make them
liable only for injury resulting from their own negligence
until such a time as they should give notice to the consignee
and a reasonable time had elapsed for the removal of the
goods.   The reliance of the appellants in support of this con-
tention is chiefly placed upon the cases of *Gleadell* v. *Thomson*
(56 N. Y. 194); *Collins* v. *Burns* (63 N. Y. 1), and *Constable*
v. *Nat. S. S. Co.* (154 U. S. 51).

In *Gleadell* v. *Thomson* the action was brought by the
carrier for the freight and charges specified in the contract.
The plaintiff had received a quantity of sheet iron to carry
by ship from London to the port of New York.   After the
arrival of the vessel the sheet iron was unloaded during the
night upon the pier and the defendants had sent tarpaulins
by their own servants to cover the iron and protect it from
injury from an impending storm.   While the defendants'
agents were engaged in placing the tarpaulin over the iron a
large piece of the tarpaulin was forcibly taken from them by
persons in the employ of the plaintiff, against their protest,
to cover the hatch of the ship, thus leaving a portion of the
sheet iron unprotected from the storm.   The defendants
sought to offset the damages thus resulting to them to the
plaintiff's claim for freight and this court held they were
entitled to recover.   In delivering the opinion of the court,
however, it was said by Andrews, J., that "The landing of
the goods upon the pier of the plaintiff under the circum-
stances of this case did not, we think, change his relation to
the goods and divest him of his custody of them as a carrier.
The privilege to make this disposition of them was secured to
him by the bill of lading unless the consignee was ready to
take the goods from the ship whenever it was ready to dis-
charge.   It was not incumbent upon the plaintiff to give
notice of a readiness to discharge the goods as a condition of
his exercising the privilege of depositing them upon the pier.

They, however, remained after such deposit in his custody as carrier, subject to the modified responsibility created by the contract, until after notice had been given to the consignees of their arrival, and a reasonable time had elapsed for their removal. Meanwhile, the defendants assumed the risk of fire, loss or injury to the goods, according to the contract; but the language used did not exempt the plaintiff from liability for an injury resulting from his own negligence."

It is upon that portion of the opinion stating "It was not incumbent upon the plaintiff to give notice of a readiness to discharge the goods as a condition of his exercising the privilege of depositing them upon the pier" that the defendants base their claim in this case. It will be observed, however, that in that case the agents and servants of the consignee were actually present upon the dock trying to preserve their property from injury by covering it with tarpaulins which they themselves had furnished, but which had been forcibly taken from them by the plaintiff. It is, therefore, apparent that the clause of the opinion specifically referred to by the defendants in this case was not involved in the question under consideration in that case and it cannot be considered as a final determination of the question as to whether notice is or is not necessary to be given. In this connection attention is called to the case of *Tarbell* v. *Royal Exchange Shipping Co.* (110 N. Y. 170, 180), in which the same learned judge, speaking for the court, says with reference to the question of notice: "The obligation of the shipowner is not only to carry the goods to the port of destination, but to deliver them there to the consignee. But a delivery which will discharge the carrier may be constructive and not actual. To constitute a constructive delivery the carrier must, if practicable, give notice to the consignee of the arrival, and when this has been done and the goods are discharged in the usual and proper place, and reasonable opportunity afforded to the consignee to remove them, the liability of the carrier, as such, terminates. The duty of the consignee to receive and take the goods is as imperative as the duty of the carrier to deliver. Both obliga-

tions are to be reasonably construed, having reference to the circumstances. The stringent liability of the carrier cannot be continued at the option, or to suit the convenience of the consignee. The consignee is bound to act promptly in taking the goods, and if he fails to do so, whatever other duty may rest upon the carrier in respect to the goods, his liability, as insurer, is by such failure terminated."

In the case of *Collins* v. *Burns* the goods were shipped from Liverpool to Jersey City and were deposited upon the wharf of the defendant, which was an inclosed warehouse. The consignee had been given notice and had removed part of the goods, but a portion had been stolen from the warehouse through the negligence of the defendant's gatekeeper, and the action was brought to recover for such goods. It was held in that case that the defendant was liable as warehouseman. This liability existed at common law, and there is nothing in that case that aids us in determining the question now under consideration.

In the case of *Constable* v. *Nat. S. S. Co.* (154 U. S. 51) the consignee sought to recover from the defendant goods which had been destroyed by fire after they were landed upon the dock. The defendant maintained a line of steamers plying regularly between Liverpool and New York as common carriers, having a regular pier in the North river, at which it usually docked its vessels. Upon the arrival, however, of the vessel bringing the plaintiff's goods the pier was occupied by other vessels, and was so blocked by ice that the vessel could not reach the dock. The agent of the defendant, therefore, procured from the Inman Steamship Co. a permit to land at its dock, which was six hundred feet distant from the defendant's dock. The goods of the consignee were at once landed upon the Inman dock and subsequently destroyed by fire before notice of such landing had been given to the consignee. The defendant had obtained a permit from the custom house to discharge freight, and notice of the time and place of discharge was posted on the bulletin board of the custom house, and thereupon the discharge of the cargo from

the vessel was commenced at 4 : 30 o'clock in the afternoon. The court held that the defendant was not liable. The bill of lading was substantially in the same form as that now under consideration. Mr. Justice Brown, who delivered the prevailing opinion of the court, concedes the common law of the sea with reference to the delivery of a cargo and the liability of the carrier to be the same as that to which we have referred. He claimed, however, that under the modern custom of transacting business by the large transatlantic passenger steamers, such as that under consideration, which arrive and depart upon regular schedule days, of which the public has notice, where the consignees of the cargo may be numbered by the hundreds, and the piers of the regular steamship lines are well known to every importer and the day of arrival of each steamer may be predicted almost to a certainty ; the necessity for the common-law notice of the arrival and place of discharge of the cargo no longer exists with reference to such vessels and, therefore, he concluded : " 1. That the stipulation in the bill of lading that respondent should not be liable for a fire happening after unloading the cargo was reasonable and valid. 2. That the discharge of the cargo at the Inman pier was not in the eye of the law a deviation such as to render the carrier an insurer of the goods so unladen. 3. That if any notice of such unloading was required at all, the bulletin posted in the custom-house was sufficient under the practice and usages of the port of New York. 4. That libellants, having taken no steps upon the faith of the cargo being unladen at respondent's pier, were not prejudiced by the change." In discussing the question with reference to the berthing of the vessel at the Inman pier of the respondent company, the learned justice says : " If it be true that the pier of the respondent company was so blocked that the *Egypt* could not obtain access to it to discharge her cargo, it was, so far from being a deviation, a matter of ordinary prudence to select a neighboring pier for that purpose. Had this cargo been discharged at a *remote, unusual, or inaccessible spot,* or upon an uncovered pier, so that it was exposed to the weather

or to any unusual hazard, and a loss had been incurred, we should not have hesitated to hold the carrier liable, notwithstanding the stipulation against the consequence of negligence in its bill of lading.".

It will be observed, however, that the learned justice's conclusion is based upon the modern custom existing with reference to the great transatlantic steamships engaged in carrying passengers and light freight, which ply between specified ports, running upon schedule time so that consignees of freight know almost to a certainty the ·day on which their goods will arrive.  Under such circumstances, he holds that the notice required by the common law should no longer be required, but that posted upon the bulletin board in the custom house should be deemed sufficient.  The question thus arises as to whether the rule adopted in that case applies to the one which we now have under consideration.  The court might have found that the steamship *Louise* was not run upon any schedule time; that the defendants did not have any separate pier or ·dock of their own, at which she was always berthed upon her arrival in port; that she was not recognized as one of the swift, great transatlantic passenger steamships, but was generally classed as a freight vessel and that the consignees, therefore, could not estimate or determine with reasonable certainty as to the day on which she would arrive, or at what pier or wharf she should finally find her berth.  The bill of lading, as we have seen, is silent upon the question of notice.  The rule is that an affreightment contract, modifying or qualifying the carrier's common-law liability, must be strictly construed; and, in so far as it is ambiguous or leaves the intention of the parties in doubt it is to be construed against the steamship company.· (*Edsall* v. *Camden & Amboy R. R. & Tr. Co.*, 50 N. Y. 661; *Taylor* v. *Liverpool & G. W. S. Co.*, L R. [9 Q. B.] 546; Bishop on Contracts, 411; Carver on Carriers, § 77.)

Under the bill of lading, as we have seen, the goods are to be taken from the ship by the consignee directly as they come to hand in the discharging of the ship.  As we understand

this, the consignee has the right to take the goods *directly from the ship* as soon as it has been berthed and the master is ready to discharge the cargo. The consignee may, therefore, relieve himself from liability to the warehouseman, or from the risk of fire, or loss or injury on the dock, to which the vessel may be moored. But how can he do this unless he has notice of the arrival and place of berth? Under the common law he was entitled to such notice if practicable. But he cannot be permitted to unreasonably delay the vessel in the discharge of her cargo. As was said by ANDREWS, J., in *Tarbell* v. *Royal Exchange Shipping Co. (supra)*: "The stringent liability of the carrier cannot be continued at the option, or to suit the convenience of the consignee. The consignee is bound to act promptly in taking the goods, and if he fails to do so, whatever other duty may rest upon the carrier in respect to the goods, his liability, as insurer, is by such failure terminated." He must, therefore, maintain a known residence or a place of business where notice may reach him speedily, and be prepared to act promptly.

Again, referring to the facts in this case, it will be observed that the plaintiff did have notice between two and three o'clock of the day of the arrival of the vessel and of her docking at a pier on Staten Island. The freight of the plaintiff consisted of seven hundred bags of hemp seed. The duty devolved upon the trial court of determining the facts. Was the character and business of this vessel such as to bring her within the rule prevailing with reference to large transatlantic passenger steamers, or did she discharge her cargo at a remote, unusual or inaccessible spot, within the exception to the rule, and was notice given of her arrival to the plaintiff and a reasonable time given him to appear at the berth of the vessel and take charge of the freight, considering its character, quantity and place of discharge? Under the manner in which the parties submitted this case to the trial court these questions of fact must be deemed to have been determined in favor of the plaintiff. We, consequently, conclude that the defendants were not relieved of their liability as

common carriers by a discharge of the goods upon the dock, under the circumstances of this case, and that such liability is not dependent upon the question whether they were guilty of negligence with reference to their destruction.

The judgment should be affirmed, with costs.

CULLEN, Ch. J., O'BRIEN, VANN, WERNER and HISCOCK, JJ., concur; WILLARD BARTLETT, J., not sitting.

Judgment affirmed.