STEPHEN M. WELD et al., Respondents, v. POSTAL TELEGRAPH-CABLE COMPANY, Appellant.

Telegraph companies — when company liable for mistake in unrepeated message — speculation in rise or fall of prices of goods or stocks, with no intention to deliver either — telegraph company not liable for loss in such a speculation caused by error in telegram.

Plaintiff's firm gave to one of the defendant's operators in its office in the New York Cotton Exchange the following message for transmission by telegraph to New Orleans: "Ellis, N. O. Sell 20 Thousand Mch. 12.70 Weld." When delivered in New Orleans the message read thus: " Sell twenty thousand March 1207. Well." The message as delivered to the defendant's operator in New York was intended to instruct the plaintiff's broker, Ellis & Co., in New Orleans, to sell 20,000 bales of cotton at 12.70 cents per pound for delivery in March. In the message as delivered the numerals " 12.70" were changed to " 1207." As a result of this mistake made by the defendant, the plaintiffs suffered a substantial loss for which they recovered on the verdict of a jury in this action.

The original message not having been repeated, the trial court properly charged the jury that the conditions printed on the blank or form upon which it was sent were binding upon the plaintiffs, and absolved the defendant from liability for damages unless they were occasioned by the defendant's gross negligence. Under the unanimous affirmance by the Appellate Division, of the judgment recovered by the plaintiffs, the defendant's gross negligence must be deemed to have been conclusively established.

On examination of the entire charge bearing upon that question the instruction that the magnitude of the transaction affected by the mistake in the telegram must be considered in determining the degree of defendant's negligence, was held to be free from error which can be definitely stigmatized as prejudicial to defendant, the jury having also been instructed that the amount involved did not determine the degree of care to be exercised in the transmission of the message.

The plaintiffs had the right to recover such damages as were the natural and necessary result of defendant's negligence, after the plaintiffs had exercised reasonable care in reducing their loss as far as possible. They were not bound to await the future developments of an uncertain and speculative market, and they had the right to act in the light of existing conditions. According to these conditions the difference between the price at which the plaintiffs sold and the price at which

they where able to repurchase was the fair and just measure of their damages.

A man may lawfully sell goods or stocks for future delivery, even though he has none in his possession, if he really intends and agrees to deliver them at the appointed time. Such a transaction constitutes a valid contract, which is enforceable in the courts. But a man may not, under the guise of such a contract, enter into a naked speculation upon the rise or fall of prices, in which there is to be no delivery of property, and no payment except such as may be necessary to provide for differences arising purely from market fluctuations. Such a transaction is a mere wager, which is condemned alike by statute and public policy. Requests to charge this rule in substance were made in different forms and denied. Since the jury might have drawn inferences from the testimony that it was not the intention of the parties to sell and deliver actual cotton, but simply to record the market fluctuations upon the basis of which settlements were to be made between the parties, such refusal constitutes reversible error.

*Weld* v. *Postal Telegraph-Cable Co.*, 132 App. Div. 924, reversed.

(Argued May 17, 1910; decided June 7, 1910.)

APPEAL from a judgment of the Appellate Division of the Supreme Court in the first judicial department, entered May 17, 1909, affirming a judgment in favor of plaintiffs entered upon a verdict and an order denying a motion for a new trial.

The plaintiffs are partners engaged in the business of cotton brokers, having their principal place of business in the city of New York. They are members of the New York Cotton Exchange and also of the New Orleans Cotton Exchange. The defendant is a domestic corporation engaged in the business of transmitting telegraphic messages for hire. It has a special office for this purpose in the building occupied by the Cotton Exchange in New York city and a similar office in the New Orleans Cotton Exchange. These special offices are maintained for the purpose of transmitting the messages of the members of the exchanges in connection with the buying and selling of cotton, and for the distribution of market quotations as a branch of the defendant's own business.

On December 4th, 1905, Edward M. Weld, who is one of the Cotton Exchange members of the plaintiffs' firm, gave to one of the defendant's operators in its office in the New York Cotton Exchange the following message for transmission by

telegraph to New Orleans: "Ellis, N. O.   Sell 20 thousand Mch. 12.70.   Weld."   When delivered in New Orleans the message read thus: "Sell twenty thousand March 1207. Well."   The message as delivered to the defendant's operator in New York was intended to instruct the plaintiff's brokers, Ellis & Co., in New Orleans, to sell 20,000 bales of cotton at 12.70 cents per pound for delivery in March.  In the message as delivered the numerals "12.70" were changed to "1207." As a result of this mistake made by the defendant, the plaintiffs suffered a substantial loss which they seek to recover in this action.

The message which the plaintiff Edward M. Weld gave to the defendant's operator was written on one of the printed blanks furnished by the defendant, which contained the usual stipulations limiting its liability.   On its face it contained the statement: "Send the following message, without repeating, subject to the terms and conditions printed on the back hereof, which are hereby agreed to."   Upon the reverse side were printed a number of stipulations among which were the following : "To guard against mistakes or delays, the sender of a message should order it REPEATED : that is, telegraphed back to the originating office for comparison.   For this, one-half the regular rate is charged in addition.   It is agreed between the sender of the message written on the face hereof and the Postal Telegraph-Cable Company, that said company shall not be liable for mistakes or delays in the transmission or delivery, or for non delivery, of any UNREPEATED message, beyond the amount received for sending the same; nor for mistake or delays in the transmission or delivery, or non-delivery of any Repeated message beyond fifty times the sum received for sending the same, unless specially insured, nor in any case for delays arising from unavoidable interruption in the working, of its lines, or for errors in cipher or obscure messages. *   *   *   Correctness in the transmission of messages to any point on the lines of the company can be INSURED by contract in writing, stating agreed amount of risk and payment of premium thereon, at the following rates, in addition to the

usual charges for repeated messages, viz: one per cent for any distance not exceeding 1,000 miles, and two per cent for any greater distance."

The complaint sets forth in great detail the circumstances surrounding the sending and receipt of this message, and charges the defendant with gross negligence in its transmission. It is alleged that within a very short time after the receipt of the telegram by the plaintiffs' agent in New Orleans and the execution of the order contained therein to sell 20,000 bales of cotton, the plaintiffs perceived that a mistake had been made. At once they telegraphed a second order directing their agent in New Orleans to minimize the loss by purchasing 20,000 bales of March cotton in the New Orleans market at the best prices obtainable. This was done at prices which resulted in a net loss to the plaintiffs, including broker's commissions, of $27,565.

The defendant denies specifically all the material allegations, except the receipt of the message, and alleges that the message was correctly placed on the wire but that the mistake occurred during its transmission. It alleges as a separate defense the stipulations contained in the printed blank upon which the message was sent, and that they constitued an agreement which bound the plaintiffs and absolved the defendant from liability, except for the repayment of the sixty cents paid for the message.

Upon the trial it appeared that the defendant maintains special offices in both cotton exchanges in New York and New Orleans, which offices are located in close proximity to the "rings" where the buying and selling of cotton is constantly going on during the working hours of the exchanges. These offices are in charge of experienced operators familiar with the special kind of business transacted on the exchanges and with the meaning of the technical terms used in the trade. The message was sent on "Bureau day," when the government publishes its annual report in regard to the prospective cotton crop. "Bureau day" is usually a very busy one upon the cotton exchanges, as the government report causes

marked fluctuations in the market, and consequent excitement and activity in buying and selling. Shortly after this particular report had been made public, the plaintiff Edward M. Weld, representing the plaintiffs' firm, went to one of the defendant's operators in the New York Cotton Exchange and requested him to send the message in question. At first it was given orally. Being an unusually large order, induced by the fact that upon the publication of the government report the price of cotton on the New Orleans Exchange had risen very rapidly, the operator sent word over the wire to the New Orleans operator to prepare for a large order. The written message was then given to the New York operator and he sent it over the wire. The New Orleans operator wired back to ascertain whether "twenty thousand" was correct, and the New York operator responded "Yes." No other part of the message was confirmed, although the plaintiff's evidence tended to show that it was the custom to confirm (that is, to repeat) orders thus sent, in order to insure accuracy.

The service between these two exchanges was carried on by means of two direct wires known as "A" and "B." There were relay stations on these lines to replenish the current, but the sending of a message involved no human intervention between these two terminals. The message in question was sent over wire "B." This wire ran directly to the main office of the defendant in New Orleans, where it passed through a machine known as a "Morsegraph," from which it ran to the New Orleans Cotton Exchange. The Morsegraph automatically records on a tape all messages which go over the wire passing through it. The defendant also keeps a book called a "log" of the working of the Morsegraph. These records are kept by the defendant for six months from the day when the messages recorded pass over the wires. Prior to the expiration of the six months from the time when this particular message was sent, the plaintiffs' attorney notified the defendant to preserve the records of this message, as they would be needed at the trial of this action. This the

defendant failed to do, and at the trial it was admitted that they had been destroyed. The message as delivered to the plaintiffs' agent in New Orleans discloses a number of alterations besides the changing of the numerals "12.70" to "1207." The initials "N. O." after Ellis, indicating New Orleans, were omitted. The two numerals "20" before thousand, indicating twenty thousand, were written out into one word "twenty," which reduced the length of the message by one word, each numeral being counted as a word in the telegraphic code. The check mark of the number of words had, therefore, to be changed from 9 to 8. The abbreviation "Mch." was changed to "March," and the name of "Weld" was changed to "Well." The initials of the sending operator were omitted, although it is usual to insert them; the message was not dated, and the plaintiffs' evidence tended to show that the time of sending was erroneously stated. There was evidence, introduced by the defendant, tending to show that some of the above mistakes could have been occasioned by unpreventable outside causes incident to the business of transmitting messages over wires, while others were not explained. But, as opposed to any mere theory, it appeared that the message reached the defendant's main office in New Orleans in the form in which it was sent from New York, so that it is evident that the error occurred between the main office in New Orleans and the Cotton Exchange in the same city.

To establish the damages suffered by the plaintiffs they proved the sale of 20,000 bales of cotton by their brokers, Ellis & Co., at prices considerably below 12.70 cents per pound, which was the price fixed by the plaintiffs in the telegram sent by them. Then they proved that, immediately upon the discovery of the mistake, they wired their representative to buy back 20,000 bales. This was done at the best prices obtainable on that day. The course taken by plaintiffs in order to minimize their loss caused by the mistake is shown by the testimony to have been the usual method adopted on the Cotton Exchange to reduce losses in transactions of this character. The difference between the prices realized

upon the sale of the 20,000 bales and the prices at which the other 20,000 bales were subsequently purchased in order to minimize the loss, together with broker's commissions, amounted to $27,565. That is the amount, with interest, which the plaintiffs sued to recover.

In submitting the case to the jury the learned trial court held as matter of law that the conditions printed upon the defendant's blank used in sending the message were reasonable, and created a contract which bound the plaintiffs and exempted the defendant from liability for loss occasioned by its slight or ordinary negligence, but that it did not exempt the defendant from the consequences of its gross negligence. The court then defined to the jury the legal meaning of gross negligence as distinguished from ordinary negligence, and left it to the jury to say, as a matter of fact, whether, under the evidence adduced, the defendant was guilty of gross negligence. The jury rendered a verdict in favor of the plaintiffs for $10,000, and the judgment entered thereon having been unanimously affirmed by the Appellate Division, the defendant has appealed to this court.

*Austen G. Fox* and *William W. Cook* for appellant. The contract protected the defendant against liability for transposition of figures by the operator in New Orleans, as well as of any other operator. (*Primrose* v. *W. U. Tel. Co.*, 154 U. S. 1; *Halsted* v. *Postal Tel. Co.*, 193 N. Y. 293; *Kiley* v. *W. U. Tel. Co.*, 109 N. Y. 231; 39 Hun, 158; *Breese* v. *U. S. Tel. Co.*, 48 N. Y. 132; *Young* v. *W. U. Tel. Co.*, 65 N. Y. 163; *Schwartz* v. *A., etc., Co.*, 18 Hun, 157; *Bennett W. U. Tel. Co.*, 18 N. Y. S. R. 777; *Riley* v. *W. U. Tel. Co.*, 26 N. Y. Supp. 581; *Altman* v. *W. U. Tel. Co.*, 84 N. Y. Supp. 54; *Springer* v. *Westcott*, 78 Hun, 365.) The trial court erred in calling to the attention of the jury the fact that the "amount involved" in the execution of the order to buy the cotton "was tremendous," and in proceeding as follows: "Of course, that circumstance might put upon him, as I said, an extra care, an extra caution, and his degree of negligence must

be measured to some extent by that." (*Halsted* v. *Postal Tel. Cable Co.*, 193 N. Y. 293; *Stern* v. *Westchester R. R. Co.*, 99 App. Div. 491; *Buchanan* v. *Foster*, 23 App. Div. 542; *Meagley* v. *Hoyt*, 125 N. Y. 771.) There was no justification for evidence of the purchase by plaintiffs of 20,000 bales of cotton. (*Sargeant* v. *Blunt*, 16 Johns. 74; *McMorris* v. *Simpson*, 21 Wend. 610; *W. M. V. Co.* v. *Brady*, 181 N. Y. 145.) The presumption is, and there was no contention to the contrary in the courts below, that the plaintiffs were ordering the sale of cotton which they had on hand in New Orleans available for delivery. (*Cahn* v. *W. U. Tel. Co.*, 48 Fed. Rep. 810.) The trial court erred in refusing various requests to charge in effect that if the transactions in question did not involve an actual delivery of the cotton, the plaintiffs could not recover. (*Hurd* v. *Taylor*, 181 N. Y. 231; *Bigelow* v. *Benedict*, 70 N. Y. 207; *Embrey* v. *Jemison*, 131 U. S. 336; *Hill* v. *Levy*, 98 Fed. Rep. 94.) Plaintiffs had no right to purchase cotton at a loss in December for delivery in March, or, in any event, until the time for delivery arrived and it became necessary to purchase at a loss in order to deliver the cotton. (*Hibbard* v. *W. U. Tel. Co.*, 33 Wis. 558; *Williams* v. *Reynolds*, 6 B. & S. 495.) If the plaintiffs had the right to repurchase the cotton at the expense of the defendant, they were bound to do so in the cheaper of the two markets, New York or New Orleans. (*Baldwin* v. *U. S. Tel. Co.*, 45 N. Y. 744; *Dillon* v. *Anderson*, 43 N. Y. 231; *Roberts* v. *White*, 73 N. Y. 375; *Milage* v. *Woodward*, 186 N. Y. 252; *Johnson* v. *Meeker*, 96 N. Y. 93; Joyce on Electric Law, § 972.)

*Edward H. Blanc* and *Gordon Knox Bell* for respondents. A telegraph company cannot limit its liability " for mistakes or delays in the transmission or delivery or for the non-delivery of messages caused by the negligence of its servants," if such mistakes, delays or non-delivery be due to willful misconduct or gross negligence. (*Pearsall* v. *W. U. Tel. Co.*, 124 N. Y. 256, 267; *Breese* v. *U. S. Tel. Co.*, 48 N. Y. 132, 141; *Kiley* v. *W. U. Tel. Co.*, 109 N. Y. 231; *Halsted* v.

*Postal Tel. Cable Co.,* 193 N. Y. 293; *Elwood* v. *W. U. Tel. Co.,* 45 N. Y. 549; *Leonard* v. *N. Y., A. & B. E. M. Tel. Co.,* 41 N. Y. 544; *Nolton* v. *W. R. R. Co.,* 15 N. Y. 444; *M., etc., R. R. Co.* v. *Arms,* 91 U. S. 489; *New World* v. *King,* 16 How. [U. S.] 470.) There was no error in the charge or refusals to charge. (*Le Gendre* v. *S. U. & N. Ins. Co.,* 183 N. Y. 392; *Halsted* v. *Postal Tel. Cable Co.,* 193 N. Y. 293; *Primrose* v. *W. U. Tel. Co.,* 154 U. S. 1.) There was not a vestige of evidence offered to show any intent not to deliver cotton under these contracts, or to refute the proof that actual delivery was intended. The trial court, therefore, properly refused to charge in regard thereto as requested by defendant. (*Kingsbury* v. *Kirwan,* 77 N. Y. 612; *Hurd* v. *Taylor,* 181 N. Y. 231; *Bibb* v. *Allen,* 149 U. S. 481; *Clews* v. *Jamieson,* 182 U. S. 461; *Board of Trade* v. *Christie Grain & Stock Co.,* 198 U. S. 236.) It was the plaintiffs' duty to minimize the damage as far as reasonably possible. In the performance of such duty they properly adopted the means of liquidating the damage in the safest, surest and promptest manner afforded by the machinery of their exchange. (*Baldwin* v. *U. S. Tel. Co.,* 45 N. Y. 744.) The proper measure of damages was adopted. (*Rittenhouse* v. *Independent Line,* 44 N. Y. 263; *Tyler, Ullman & Co.* v. *W. U. Tel. Co.,* 60 Ill. 421.) The contention that the purchases should have been made in the New York and not in the New Orleans market cannot be sustained. (*Leonard* v. *N. Y., etc., Tel. Co.,* 41 N. Y. 544; *Washington & N. O. Tel. Co.* v. *Hobson,* 15 Gratt. 122; *Isham* v. *Erie R. R. Co.,* 112 App. Div. 612.)

WERNER, J. To the extent that the judgment herein depends upon competent evidence properly submitted to the jury, the unanimous affirmance in the Appellate Division precludes the possibility of further review. We are asked, however, to pass upon certain legal questions raised at the trial, which depend for their correct solution upon a proper view of the evidence and a clear understanding of the charge

to the jury.    For that reason we preface our discussion with a rather voluminous statement of the facts which are pertinent to the legal questions to be reviewed.    The action is brought, as has been stated, to charge the defendant with the damages sustained by the plaintiffs through the alleged negligence of the former in transmitting a telegraphic message sent by the latter from New York to New Orleans.    The message as written by the plaintiffs was: " Ellis N. O.    Sell 20 thousand Mch. 12.70.    Weld," and as received by the New Orleans representative of the plaintiffs it had been so changed and transposed as to read : " Sell twenty thousand March 1207.    Well."    The import of the message as sent was well understood by the plaintiffs, their correspondents, and the operators of the defendant.    It contained a direction to sell twenty thousand bales of cotton for March delivery at 12.70 cents per pound, which was understood by all concerned to mean a sale at 12.70 cents or more.    The message as received was quite as clearly understood to mean a sale of twenty thousand bales of cotton for March delivery at 12.07 cents or more.    The New Orleans representatives of the plaintiffs followed the instructions set forth in the message as received, sold the designated number of bales at various prices below 12.70 cents and when the error was discovered by the plaintiffs they directed their representatives to purchase at once twenty thousand bales of cotton for March delivery at the best prices obtainable.    This was done in the New Orleans market at prices below 12.70 but above the prices at which the plaintiffs' representatives had previously sold, and the net result was a loss to the plaintiffs of $27,565.

As the original message was not " repeated " the learned trial court charged the jury that the conditions printed on the blank or form upon which it was sent were binding upon the plaintiffs, and absolved the defendant from liability for damages unless they were occasioned by the defendant's gross negligence.    Under the unanimous affirmance by the Appellate Division of the judgment recovered by the plaintiffs, the defendant's gross negligence must be deemed to have been

7

conclusively established, and the only question in that behalf
which we have power to consider is whether the rule of lia-
bility given to the jury by the trial judge correctly states the
law.

The liability of telegraph companies in respect of the
business which they carry on is regulated by two things:
1. By contract. 2. By the nature of their *quasi* public
employment. In the absence of any special contract limit-
ing or regulating their liability, they do not insure the safe
and accurate transmission of messages, but they are bound to
transmit them with a degree of care and diligence adequate
to the business which they undertake. The liability which a
telegraph company assumes under this general rule may,
however, be limited by special contract, and that is to-day the
universal practice. As it is a business requiring employees
of peculiar skill, so it is also subject to atmospheric and
physical disturbances which may set at naught the greatest
care and skill. It is, therefore, but right that telegraph
companies should have the power to limit their liability in
cases where mistakes occur through no fault on their part, or
for such mistakes of their employees as will occur through
ordinary negligence in spite of the most stringent regulations
or the most vigilant general oversight. But manifestly this
power cannot be extended further without placing the public
absolutely at the mercy of those engaged in transmitting tele-
graphic messages. This is the reason of the rule, long since
established in this state, that individuals and corporations
engaged in this *quasi* public business, cannot contract to
absolve themselves from liability for their own willful mis-
conduct or gross negligence. They may protect themselves
by contractual limitations that are reasonable, but beyond that
they may not go. That is the law as laid down by this court
in a number of cases. (*Breeze* v. *U. S. Telegraph Co.,* 48
N. Y. 132 ; *Kiley* v. *Western Union Tel. Co.,* 109 N. Y. 231 ;
*Pearsall* v. *West. Union Tel. Co.,* 124 N. Y. 256 ; *Halsted*
v. *Postal Telegraph Cable Co.,* 193 N. Y. 293.) The cases
cited all hold that a regulation limiting the liability of a tele-

graph company for a mistake in an " unrepeated " message to the price paid for sending it is reasonable, but that it does not relieve such a company against the consequences of its gross negligence.    The charge of the trial court in this respect was, therefore, clearly correct.

Counsel for the defendant argues, however, that the charge was erroneous because the jury were instructed that the magnitude of the transaction affected by the mistake in the telegram must be considered in determining the degree of the defendant's negligence.    We cannot agree with counsel in this criticism.    It is true that the trial court referred to the importance of the transaction, but that was not improper in view of the conceded other facts which served to charge the defendant's operator with notice that the figures relating to amount and price were of the utmost significance.    It is to be noted, moreover, that the trial court very plainly told the jury that the amount involved did not determine the degree of care to be exercised in the transmission of the message. This could be amply demonstrated by excerpts from the charge, but that would unduly extend the discussion and serve to obscure the real point in the case.    We content our- selves, therefore, with the suggestion that in this regard the main charge seems to be free from any error which can be definitely stigmatized as prejudicial to the defendant.

We are of opinion also that the defendant's exceptions to that part of the main charge which relates to the measure of dam- ages and the allowance of interest are not well taken.    If the transactions between the plaintiffs and their New Orleans correspondents are assumed to have been the sale and pur- chase of contracts under which there was to be a future deliv- ery of cotton it was lawful.    In that aspect of the case we do not see why the measure of damages applied was not correct. The plaintiffs had the right to recover such damages as were the natural and necessary result of defendant's negligence, after the plaintiffs had exercised reasonable care in reducing their loss so far as possible.    Even if it be conceded, as claimed by defendant, that plaintiffs were under no obligation

to buy cotton to minimize their loss, the defendant is in no position to complain when it clearly appears, as it does, that the action taken inured to its advantage. We regard as untenable the argument that the prices in March, when the cotton was to be delivered, might have been such as to result in no loss to the plaintiffs. They were not bound to await the future developments of an uncertain and speculative market, and they had the right to act in the light of existing conditions. According to these conditions the difference between the price at which the plaintiffs sold and the price at which they were able to repurchase was the fair and just measure of their damages, and since the verdict was for a much smaller sum than that to which the plaintiffs were entitled upon that basis, the defendant has no real grievance. In that connection, however, the defendant's counsel made a request to charge which is not so easily disposed of. This request is that, " If, after the plaintiffs discovered the mistake, it was practicable for them, acting with ordinary diligence and care, to have bought on the New York Cotton Exchange cotton of the same quantity and quality as that which Henican had sold for them in New Orleans, and to have done so at less price than that at which Henican had sold in New Orleans, taking into consideration freight from New York to New Orleans and all the other considerations and differences named by the plaintiff Weld in his testimony, then the jury must find a verdict for the defendant."

Assuming, as we do assume, that it was the duty of the plaintiffs to exercise reasonable diligence to minimize their damages, it must follow that it was equally their duty to annihilate them if they could. As an abstract legal proposition, therefore, this request to charge was correct, for, if the plaintiffs could have bought in the New York market at prices which would have freed them from all loss, they should have done so. It is not clear, however, that the state of the record justified this request. It appears that the classification and establishment of differences in the grades of cotton were entirely dissimilar on the two exchanges in New York and

New Orleans, and that there are difficulties in complying in New York with contracts made in New Orleans. Since it does not clearly appear what these difficulties were, we cannot say that the refusal to charge this request is error for which we should reverse this judgment. But there must be a reversal upon other grounds, and for that reason we have discussed this ruling so that the record may be made more definite upon another trial.

We now turn to a series of requests made by defendant's counsel, which we think should have been charged. Defendant's counsel asked the court to charge: " That, if the jury find as a fact that when plaintiffs sent the message to Ellis & Co. to sell 20,000 bales, March cotton, the plaintiffs did not intend to deliver cotton, and that it was the plaintiffs' intention that one party to the sale was to pay to the other only the difference between the prices named and the market price of the cotton at the date fixed for executing the contract, then the whole contract constituted nothing more than a wager, and the plaintiffs are entitled to a verdict for only sixty cents." And, again, " That, if the jury find as a fact that it was not the intention of the plaintiffs or of Henican, or of the persons to whom he made sales, that there should be purchase or delivery of actual cotton, but that it was understood by them all that the settlement of all such sales should be made entirely by one party paying to the other the difference between the prices named in the contracts of sale and the market price of said cotton futures, according to the fluctuations of the market, then the plaintiffs are entitled to a verdict of only sixty cents." And again, " That if the jury find as a fact that it was not the intention of the plaintiffs to deliver at any time cotton under the sales made by Henican, but that it was their intention that a contract should be made which should be closed at a future day, not by delivery of cotton and payment to plaintiffs of purchase price, but by the payment of money to the one or to the other, the party to receive the same and the amount to be paid to be determined upon a basis of the difference between the agreed price and the actual market

value of the cotton on the day when the contracts were to be closed, then .the plaintiffs are entitled to a verdict for only sixty cents." And again, " That if the jury are not bound by the form of the transactions on the New Orleans Cotton Exchange, and if the jury find as a fact that, under the guise of contracts for the sale of cotton, the real intent of plaintiffs was not to deliver any actual cotton, but merely to speculate in the rise and fall of prices, and to close the transactions by mere payments of differences, then the plaintiffs are entitled to a verdict for only sixty cents." And again, " That in determining what was the real purpose of plaintiffs in regard to delivering actual cotton, or merely speculating in the rise and fall of prices, for the purpose of settling the transaction by the payment of differences, the jury may take into consideration the testimony of Henican that no actual cotton was delivered, but that the original transactions of sales and the subsequent purchases were settled by the payment of differences only." To all of these requests the learned trial judge responded : " Other than I have already charged on the subject I decline to charge." As the subject covered by these requests had not been referred to in the main charge, we are called upon to decide whether the exceptions taken to these refusals constitute valid grounds for a reversal of the judgment herein and the granting of a new trial.

As bearing upon the nature of the transactions between the plaintiffs and those who dealt with them through Henican, one of plaintiffs' New Orleans correspondents, Henican testified that there was no delivery of cotton, and that the transaction consisted entirely of a "settlement of differences." This testimony was supplemented by an account of sales, from which the jury might have drawn the inference that it was not the intention of the parties to these contracts to sell and deliver actual cotton, but simply to record the market fluctuations upon the basis of which settlements were to be made between the parties. This testimony, although meagre and perhaps inconclusive, was hostile to the legal presumption that the transactions were

lawful, and was sufficient to create an issue of fact upon which the defendant had the right to a charge embodying the substance of the requests above quoted.    If the transactions between the plaintiffs and their clients or customers were mere wagering contracts, they are void under the statutes of this state and the general law of the land.    The generally accepted rule upon this subject can be very simply stated.    A man may lawfully sell goods or stocks for future delivery, even though he has none in his possession, if he really intends and agrees to deliver them at the appointed time.    Such a transaction constitutes a valid contract, which is enforceable in the courts. But a man may not, under the guise of such a contract, enter into a naked speculation upon the rise or fall of prices, in which there is to be no delivery of property, and no payment except such as may be necessary to provide for differences arising purely from market fluctuations.    Such a transaction is a mere wager, which is condemned alike by statute and public policy.    (*Embrey* v. *Jemison,* 131 U. S. 343 ; *Bigelow* v. *Benedict,* 70 N. Y. 202; *Hurd* v. *Taylor,* 181 N. Y. 231.)

For the failure of the learned trial court to charge in substance as requested upon this branch of the case, the judgment herein must be reversed and a new trial granted, with costs to abide the event.

Cullen, Ch. J., Gray, Vann, Willard Bartlett and Chase, JJ., concur; Hiscock, J., concurs in result.

Judgment reversed, etc.