*123 OPINION OF THE COURT
Myriam J. Altman, J.
The July 13-14, 1977 system-wide blackout in the New York Metropolitan area brought public attention to the fact that the Consolidated Edison Company of New York (Con Ed) claims an exemption from liability for ordinary negligence based upon an exculpatory clause in its tariff, or rate schedule, on file with the Public Service Commission (PSC). At a time when "the uninterrupted continuity” of electric service "is essential to health and safety” (Memphis Light, Gas & Water Div. v Craft, 436 US 1, 14, n 15), the impact of such an exemption demands that its validity be seriously questioned. An examination of the applicable law leads me to the conclusion that the public policy and law of this State require rejection of Con Ed’s exculpatory provision as a defense in the cases before me. Following a preliminary description of the history of those cases and my findings of fact and conclusions of law concerning ordinary and gross negligence, I will discuss the official status of the tariff, my jurisdiction to review the validity of the exemption, the New York law and public policy applicable to exculpatory agreements involving public interest and a determination of Con Ed’s liability to the various plaintiffs.
These 14 plaintiffs instituted small claims actions against Con Ed to recover damages incurred as a result of the July, 1977 blackout. The plaintiffs fall into two categories, those who have a direct contractual relationship with Con Ed and those who lost wages because their places of employment were closed during the blackout.
After the cases were called, the parties in each case stipulated that a blackout occurred on July 13, 1977, and that power was restored at varying times to different locations in Manhattan on July 14, 1977. The Con Ed blackout report (Third Phase Report, System Blackout and System Restoration, July 13-14, 1977, 5 volumes [hereinafter Third Phase Report]) was admitted into evidence in plaintiffs’ cases as an admission of defendant. I then made the following findings in each case: (1) that the fact of the blackout’s occurrence was prima facie evidence of negligence under the doctrine of res ipsa loquitur; and (2) that defendant, with exclusive knowledge of why the blackout occurred, had the burden of coming forward with evidence that the blackout did not occur as a result of its negligence and that it was not negligent in taking *124 so much time to restore power. I then took testimony in each case as to damages and made findings on that issue.
At the close of all the plaintiffs’ cases the defendant rested, relying predominantly on its tariff, which provides in relevant part: "The Company will endeavor at all times to provide a regular and uninterrupted supply of service, but in case the supply of service shall be interrupted or irregular or defective or fail from causes beyond its control or through ordinary negligence of employees, servants or agents the Company will not be liable therefor” (PSC No. 8, Sixth Revised Leaf No. 19, eff June 17, 1977).
Defendant then moved to dismiss all of the cases on the grounds that a finding of gross negligence cannot be based upon res ipsa loquitur and that the plaintiffs had not proven gross negligence. With respect to the wage earners, Con Ed moved to dismiss on the additional ground that there is no liability to those persons because they do not have a direct contractual relationship with Con Ed. Decision was reserved.
I now find that defendant Con Ed was negligent. I make this finding on the basis of res ipsa loquitur and, independently, in reliance upon the various blackout reports which are described below. These two bases will be discussed in turn.
The res ipsa loquitur doctrine is a rule of evidence from which a permissible inference of negligence may be drawn (Foltis, Inc. v City of New York, 287 NY 108). It is operative "where the agency causing the injury is under the control or management of the one charged with negligence and the surrounding circumstances are such that the accident would probably not have occurred if reasonable diligence had been exercised” (41 NY Jur, Negligence, § 87, p 105).
In relying on res ipsa loquitur, plaintiffs need not demonstrate single control by defendant over the New York City power supply (see Corcoran v Banner Super Market, 19 NY2d 425, 430-433; Schroeder v City & County Sav. Bank of Albany, 293 NY 370, 374) and, indeed, Con Ed stated as much when it relied on the same cases in a recent unrelated Court of Appeals case, De Witt Props. v City of New York (44 NY2d 417). Whatever roles lightning, the New York Power Pool and other utility companies played in the blackout are not significant at this point, for Con Ed’s almost complete control (see Third Phase Report, vol 5, p 111) is sufficient indication "that it probably was the defendant’s negligence which caused” the blackout (Corcoran v Banner Super Market, supra, p 432). It is *125 improbable that the blackout would have occurred if Con Ed had been reasonably careful (see Shankman v Con Edison, 94 Misc 2d 150, and cases cited therein; see, also, Foltis, Inc. v City of New York, supra). Plaintiffs’ reliance on res ipsa loquitur is therefore appropriate.
Because no presumption arises through use of res ipsa loquitur, even if defendant fails to come forward with evidence to explain the occurrence, the burden of proof remains with plaintiff (Wetsell v Reilly, 159 App Div 688). The trier of fact must make the ultimate determination of whether defendant was negligent (Davis v Goldsmith, 19 AD2d 514). I find that, on the proof submitted at the trials, defendant was negligent.
Additionally, and on my own motion, I take judicial notice of: "A Report by a Staff Task Force from the Department of Public Service to the Governor of the State of New York on the Events Leading to the Consolidated Edison Company Blackout of July 13, 1977”; "Second Report — The Events Leading to the Consolidated Edison Company Blackout of July 13, 1977 by a Staff Task Force from the Department of Public Service” (hereinafter Second Report); and "State of New York Investigation of the New York City Blackout July 13, 1977” (hereinafter State Report), which was issued in January, 1978 (see Matter of Siwek v Mahoney, 39 NY2d 159; Matter of Sunhill Water Corp. v Water Resources Comm., 32 AD2d 1006; Public Service Law, § 16). Defendant cites the State Report in its reply brief.
I take judicial notice of these reports even though I do not have certified copies thereof (see Public Service Law, § 17). These are small claims actions where the aim is to do substantial justice between the parties and the court is not "bound by statutory provisions or rules of practice, procedure * * * or evidence” (CCA, § 1804).
I make independent findings that Con Ed was negligent in allowing the blackout to occur and that it was negligent in the restoration of power. I base these findings on the reports in their entirety, having also considered Con Ed’s reports and have determined as the trier of fact that the PSC reports should receive more evidentiary weight. The following are examples of instances of negligence:
(1) Incorrect relaying operation, including the erroneous opening of the 345kv circuit breakers at Ladentown on line Y88 at 8:37 p.m. (Second Report, p II-6).
*126 (2) Failure to shed load on at least five occasions between 8:57 p.m. and 9:22 p.m., after being told to do so by the Pool Senior Pool Dispatcher (Second Report, pp III-4, IV-8; see, also, State Report, p 13) and failure to exercise reasonable, independent judgment regarding the need for load shedding (State Report, p 50).
(3) Unsuccessful manual load shedding due either to faulty equipment or human failure (Second Report, p III-6).
(4) Unqualified or improperly trained personnel in charge of load shedding decision-making (Second Report, p III-12).
(5) Reliance on reserve power to be provided by gas turbines when some of these machines were not staffed around the clock and could not be started up by remote control (Third Phase Report, vol 5, p 85; Second Report, III-18).
(6) Con Ed’s supply of erroneous data to the Power Pool and its failure to update information previously furnished the Pool (Second Report, pp III-17, IV-3; Third Phase Report, vol 5, pp 72-73; State Report, p 30).
(7) Improper design for contingency problems anticipated at Buchanan in 1973 (State Report, p 34).
(8) Inadequate testing procedures (State Report, p 39).
(9) Failure to treat the lack of reasonable safety margin as an emergency during the period between 8:37 p.m. and 8:55 p.m. (State Report, p 42).
(10) Failure to plan for high system voltage conditions during a blackout and the effects of high voltage on equipment, and overreliance on pressure in underground cables which is lost several hours after loss of power (Third Phase Report, vol 1, pp 20-23).
My independent findings of negligence, made on my own motion, do not deprive plaintiffs of entitlement to a finding of negligence on the basis of res ipsa loquitur. Although a plaintiff may not rely upon the doctrine of res ipsa loquitur where he has proven specific acts of negligence (see Zaninovich v American Airlines, 26 AD2d 155), here plaintiffs have shown no specific acts of negligence.
The defenses of "act of God” and industry standards are unavailable to Con Ed. Although the chain of events which led to the blackout began with lightning, an "act of God” (1 NY Jur, Act of God, § 1), Con Ed cannot avoid liability by claiming that an "act of God” caused the blackout (see 1 NY Jur, Act of God, § 1). A loss cannot be attributed to an "act of God” if it is *127 the result of any person’s aid or interference, if concurrence of human agency is involved, or if injury might have been avoided by human prudence and foresight (Woodruff v Oleite Corp., 199 App Div 772). Con Ed’s acts of negligence, not the least of which were the repeated refusals to shed load, prevent it from successfully relying on lightning as a defense. The rule is equally inappropriate as a defense to the inference of negligence based on res ipsa loquitur.
Whatever argument may be made that Con Ed abided by standards set for the industry is not persuasive, for defendant must nonetheless exercise reasonable care (see Saglimbeni v West End Brewing Co., 274 App Div 201, affd 298 NY 875). Additionally, the standards set by the authorities and described by the blackout reports are not directly relevant to the acts of negligence with which I am concerned (see Third Phase Report, vol 1, p 25; vol 5, §§ 1, 2, and Appendix 1).
Accordingly, I find that Con Ed’s negligence was established on the bases of res ipsa loquitur and the blackout reports.
Con Ed claims that under its tariff, the measure of its liability is gross negligence and not ordinary negligence. The authorities are uniform in holding that gross negligence cannot be proven by application of the res ipsa loquitur doctrine (23 ALR3d 1083 et seq.; Prosser, Law of Torts [4th ed], p 226; Restatement, Torts 2d, § 328 D [Comment on clause (c) of subsection (1)]). Res ipsa loquitur applies only where plaintiff does not know what caused the accident and negligence may be presumed from the fact that the accident occurred. Gross negligence, however, requires proof of affirmative acts. The use of res ipsa loquitur in gross negligence cases would therefore be inconsistent with the purpose of the doctrine (see Lincoln v Quick, 133 Cal App 433). Although one New York case has held that proof of an absolute failure to deliver a telegraph message, unexplained by defendant, is "prima facie gross negligence as a matter of law” (Krivitsky & Cohen, Inc. v Western Union Tel. Co., 129 Mise 431, 435, mod on other grounds 227 NYS 836), this conclusion was not supported by citation to legal authority and I see no reason in law or logic to depart from the general rule.
An argument might be made that Con Ed was grossly negligent, based upon language contained in Weld v Postal Tel.-Cable Co. (199 NY 88, 98). "[Tjelegraph companies should have the power to limit their liability in cases where mistakes occur through no fault on their part, or for such mistakes of *128 their employees as will occur through ordinary negligence, in spite of the most stringent regulations or the most vigilant general oversight”.
The blackout reports demonstrate that Con Ed was not operating under "the most stringent regulations or the most vigilant general oversight” on July 13, 1977 (see discussion, supra). However, subsequent cases indicate that New York continues to require proof of willful refusal to take precautions, failure to exercise slight care or reckless disregard in order to justify a finding of gross negligence (see, e.g., Weld v Postal Tel.-Cable Co., 210 NY 59, 72; Matter of Jenson v Fletcher, 277 App Div 454, affd 303 NY 639).
A review of the blackout reports also fails to provide a basis for a finding of gross negligence, although two instances approach that degree of negligence. One is the fact that Con Ed repeatedly disregarded advice to shed load (Second Report, p IV-8), and the second is that Con Ed furnished improper data to the New York Power Pool (Second Report, p IV-3). I find, however, that these instances form an insufficient basis for a finding of gross negligence (see Matter of Jenson v Fletcher, supra; 41 NY Jur, Negligence, §§ 26-28).
It therefore becomes necessary to reach the issue of the validity of Con Ed’s exculpatory tariff. The threshold questions are whether there is binding case law or administrative authority that the tariff is valid and, if not, whether this court has primary jurisdiction to determine the validity of the tariff.
 The contractual agreement that exists between Con Ed and any given customer (see Silver’s Lunch Stores v United Elec. Light & Power Co., 142 Misc 744, mod on other grounds 146 Misc 554) is controlled by defendant’s tariff (see Pennsylvania R. R. Co. v International Coal Co., 230 US 184, 197; Pillsbury Flour Mills Co. v Great Northern Ry. Co., 25 F2d 66, 68). However, the PSC’s acceptance of Con Ed’s current tariff for filing does not create an irrebuttable presumption of validity (see Kovarsky v Brooklyn Union Gas Co., 279 NY 304; 16 NYCRR 136.5).
The history of defendant’s exculpatory clause is as follows. In 1938 the PSC issued an opinion in Case No. 9439 which contained instructions that the PSC would not object to the inclusion of the following clauses in rate schedules of gas and electric companies: "The company will endeavor at all times to provide a regular and uninterrupted supply of service, but in case the supply of service shall be interrupted or irregular *129 or defective or fail from causes beyond its control or through ordinary negligence of employees, servants or agents the company will not be liable therefor
* * *
"The company will not be liable for any injury, casualty or damage resulting in any way from the supply or use of electricity or gas or from the presence or operation of the company’s structures, equipment, wires, pipes, applicance or devices on the customer’s premises, except injuries or damages resulting from the negligence of the company” ([1938] Appendix [unpublished opn]).
The commission suggested that language as part of an attempt to reform tariff exculpatory provisions in accordance with its interpretation of then existing case law: "It appears that under the decisions of the courts of this state a utility company may not relieve itself from liability for damages where same were caused by the gross negligence or wilful misconduct of the utility, its officers, agents or servants. While it is true that a court will hold ineffective and void a provision which seeks to release a company from liability for gross negligence or wilful misconduct, no company should be permitted to have such a clause included in its schedule, as the effect of same is to mislead customers as to their rights of action”.
Con Ed subsequently filed the exculpatory clauses in issue with the PSC. Those provisions are actually the previously quoted clauses suggested in the PSC’s 1938 opinion.
Con Ed maintains the law is settled that its exculpatory clause is enforceable, relying primarily on the PSC opinion and the decisions in Weld v Postal Tel.-Cable Co. (199 NY 88, supra) and Hamilton Employment Serv. v New York Tel. Co. (253 NY 468), which were decided long before the PSC’s 1938 opinion (see discussion, infra). Language in the 1973 case "Wazalen” v Consolidated Edison Co. of N. Y. (43 AD2d 985) nevertheless indicates that the exemption’s legality remains an open question: "We do not reach the question of whether respondent may limit its liability for loss for simple negligence by filing a provision in its tariff to that effect” (see, also, Aruta v Consolidated Edison Co. of N. Y., NYLJ, June 5, 1973, p 18, col 4). Moreover, the commission’s opinion is not conclusive on the issue of whether the exculpatory clause is valid, for the PSC does not have the power to determine a question of law (see Kovarsky v Brooklyn Union Gas Co., 253 App Div *130 635, affd 279 NY 304, supra; Lemoyne Arms v Central N. Y. Power Corp., 191 Misc 709). Whether Con Ed may exempt itself from liability for ordinary negligence by the act of filing the tariff in issue is a question of law because the provision seeks to effect a change from the common-law rule that a defendant is liable for damages flowing from its failure to use due care (see Western Union Tel. Co. v Esteve Bros. & Co., 256 US 566, 570). Only the Legislature is empowered to change prevailing rules of common law (see Major v Waverly & Ogden, 7 NY2d 332, 336).
Con Ed claims that it was within the power of the PSC to determine the validity of the exculpatory clause because the PSC may exercise limited judicial powers when they are "incidental to the exercise of its other powers” (Kovarsky v Brooklyn Union Gas Co., 279 NY 304, 313, supra). Because the PSC has the power to approve rates, Con Ed maintains that the exculpatory clause is enforceable as part of its rate schedule.
In Western Union Tel. Co. v Esteve Bros. & Co. (supra, p 571), a limitation of liability clause was upheld because it was an "inherent part of the rate”. The facts in Esteve are distinguishable, for there a choice of rates was available under the published rate schedule and those rates offered different degrees of protection (see, also, Weld v Postal Tel.-Cable Co., 199 NY 88, supra). Noting that the purpose of a tariff is to prevent discrimination against individual members of the public rather than to put the public on notice of rates for contractual consent purposes, the Supreme Court of the United States held that to permit full recovery by a plaintiff who had paid a limited recovery rate would grant "an undue preference or advantage” to the plaintiff, in contravention of section 3 of the Act to Regulate Commerce (Western Union Tel. Co. v Esteve Bros. & Co., supra, p 571). Consequently, the limitation of liability was held (p 571) to be "an inherent part of the rate”.
In contrast to the facts in Esteve, Con Ed’s customers have no range of rates with corresponding degrees of protection from which to select. Additionally, there is no evidence that either Con Ed’s rates or the PSC’s approval of those rates were wholly or partially based upon the exemption from liability for ordinary negligence (but see Abraham v New York Tel. Co., 85 Misc 2d 677), despite Con Ed’s claims that *131 the imposition of liability for ordinary negligence would mean higher rates.
I am aware that some courts have assumed that the PSC had approved Con Ed’s exculpatory clause in the valid exercise of its powers (e.g., Newman v Consolidated Edison Co., 79 Misc 2d 153), relying on Matter of Leitner v New York Tel. Co. (277 NY 180). However, Leitner confirms that where only questions of law are involved, the issue is to be determined by the court (Kovarsky v Brooklyn Union Gas Co., 279 NY 304, 311-312, supra), whereas, when the reasonableness of an agency’s decision is questioned, the issue is an administrative one (Matter of Leitner v New York Tel. Co., supra). Thus plaintiffs are not required to seek administrative review of the validity of the tariff in issue.
New York courts do not favor contractual exemptions from liability for negligence (Boll v Sharp & Dohme, 281 App Div 568, affd 307 NY 646). This is reflected in the State’s statutory scheme. A landlord cannot exempt himself from liability for negligence (General Obligations Law, § 5-321), nor can caterers (General Obligations Law, § 5-322), building service or maintenance contractors (General Obligations Law, § 5-323), garage or parking places (General Obligations Law, § 5-325) or pools, gymnasiums or places of public amusement or recreation (General Obligations Law, § 5-326).
A rule of nonliability meets with similar disfavor because it "is out of tune with the life about us, at variance with modern-day needs and with concepts of justice and fair dealing” (Bing v Thunig, 2 NY2d 656, 667). Justice, as embodied, in our common law, provides "that one may seek redress for every substantial wrong” and that a " 'wrong-doer is responsible for the natural and proximate consequences of his misconduct’ ” (Battalia v State of New York, 10 NY2d 237, 240). The State itself has waived sovereign immunity and is liable for its tortious conduct (Court of Claims Act, § 8; Simon v City of New York, 53 Misc 2d 622).
The validity of Con Ed’s exculpatory clause must be examined within the context of this statutory and common-law scheme. Whether a contractual relationship exists between the parties, whether the exculpatory language is sufficiently clear and unequivocal, and whether the relationship between the contracting parties involves the public interest (Ciofalo v Vic Tanney Gyms, 10 NY2d 294, 296) will provide the answer.
As was stated at the outset, the plaintiffs fall into two *132 categories, those who have a direct contractual relationship with Con Ed and a group of wage earners who lost a day’s pay because their place of employment ceased operation as a result of the blackout. Unfortunately for the wage earners, the Court of Appeals has recently held that a utility company is not responsible to individuals for its negligent failure to provide electricity to their employers (Beck v FMC Corp., 42 NY2d 1027). Thus, there is no legal relationship between the wage earners and Con Ed upon which liability can be based. It is regrettable that these plaintiffs’ employer, who is probably better able to bear such economic loss, did not offer some partial compensation for the lost work time. (For discussion of the "deep pocket” theory of cost spreading, see Calabresi, The Costs of Accidents, A Legal and Economic Analysis).
As to the remaining plaintiffs, Con Ed is obligated to provide "safe and adequate” service that is "in all respects just and reasonable” (Public Service Law, § 65, subd 1), and Con Ed must supply such electricity upon application therefor by an owner or occupant of a building (Transportation Corporations Law, § 12). A contractual relationship between Con Ed and the applicant ensues (Silver’s Lunch Stores v United Elec. Light & Power Co., 142 Misc 744, mod on other grounds 146 Misc 554, supra; see, also, People ex rel. Pavilion Natural Gas Co. v Public Serv. Comm., Second Dish, 188 App Div 36). Con Ed admits this contractual relationship with the remaining plaintiffs.
The clarity of the exculpatory language in Con Ed’s tariff is not free from doubt. Con Ed relies on clause (a) (PSC No. 8, Sixth Revised Leaf No. 19, eff June 17, 1977) of its tariff, which provides:
"Continuity of Supply: The Company will endeavor at all times to provide a regular and uninterrupted supply of service, but in case the supply of service shall be interrupted or irregular or defective or fail from causes beyond its control or through ordinary negligence of employees servants or agents the Company will not be liable therefor
"This provision shall not affect the Company’s liability for damages resulting from its gross negligence or willful misconduct”.
Read in a vacuum, the meaning of this exculpatory clause is clear and unequivocal. However, a subsequent portion of the *133 tariff casts doubt on the import and meaning of the above clause.
Clause (d) (PSC No. 8, Third Revised Leaf No. 19A, eff June 17, 1977) of the Tariff provides: "Company Equipment and Use of Service: The Company will not be liable for any injury, casualty or damage resulting in any way from the supply or use of electricity or from the presence or operation of the Company’s structures, equipment, wires, pipes, appliance or devices on the Customer’s premises, except injuries or damages resulting from the negligence of the Company”. "[D]am-age resulting in any way from the supply or use of electricty” would seem to include damage resulting when "the supply of service” is "interrupted or irregular or defective or [it] fail[s]”. It is also unclear how the "negligence of employees, servants or agents” differs from "the negligence of the Company” and why the negligence of one results in liability while the negligence of the other does not. Defendant has offered no elucidation of the clauses except to assert, in conclusory fashion, that clause (a) applies to these cases.
 For an exemption from liability to withstand challenge, the parties must make their exculpatory intentions absolutely clear (Van Dyke Prods, v Eastman Kodak Co., 12 NY2d 301). The contractual language must be so unambiguous that a "running reading” would reveal the meaning (Rappaport v Phil Gottlieb-Sattler, Inc., 280 App Div 424, 426, affd 305 NY 594). Con Ed’s exculpatory clause, when read in conjunction with clause (d) of the same section, does not meet the clarity test. A contract, particularly one of exculpation, must be strictly construed against the drafter (Consolidated Gas Supply Corp. v Matula, 42 AD2d 656, affd 36 NY2d 790). Therefore, the tariff is void on the ground that it is ambiguous.
While the ambiguity alone requires a finding that the tariff is unenforceable, there is a far more pervasive reason why the tariff is illegal and that is an "overriding public interest which demand[s] that this * * * provision * * * should be rendered ineffectual” (Ciofalo v Vic Tanney Gyms, 10 NY2d 294, 297-298, supra).
The fact that the Public Service Law and Public Service Commission exist underscores the public interest in the relationship between Con Ed and its customers (People ex rel. Delaware & Hudson Co. v Stevens, 197 NY 1, 9). However, I must evaluate the nature and extent of that public interest in *134 order to determine whether Con Ed’s exculpatory clause is void because it violates the public policy of this State. The scope of such an analysis was best enunciated in the case of Tunkl v Regents of Univ. of Cal. (60 Cal 2d 92). There the court considered (pp 98-101) the following six criteria as indicators that an exemption must be declared invalid: (1) "[The contract] concerns a business of a type generally thought suitable for public regulation.” (2) "The party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public.” (3) "The party holds himself out as willing to perform this service for any member of the public who seeks it, or at least for any member coming within certain established standards.” (4) "As a result of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks his services.” (5) "In exercising a superior bargaining power the party confronts the public with a standardized adhesion contract of exculpation, and makes no provision whereby a purchaser may pay additional reasonable fees and obtain protection against negligence.” (6) "[A]s a result of the transaction, the person or property of the purchaser is placed under the control of the seller, subject to the risk of carelessness by the seller or his agents.”
All of these criteria are present here, thus demonstrating the unenforceability of the exculpatory clause. The business of delivery of power is regulated by statute (see Public Service Law; Rules and Regulations of the PSC [16 NYCRR]; Transportation Corporations Law, § 12). The purpose behind the regulation was enunciated by the Court of Appeals in People ex rel. Delaware & Hudson Co. v Stevens (197 NY 1, 9, supra). "[T]he paramount purpose of the enactment of the Public Service Commissions Law was the protection and enforcement of the rights of the public. Public service corporations have been granted valuable franchises to enable them to serve the public, and they are deemed to have undertaken to render to the public the service for which they were incorporated upon receiving a proper and reasonable compensation therefor”. (See, also, People ex rel. Perceval v Public Serv. Comm., First Dist, 163 App Div 705; Lemoyne Arms v Central N. Y. Power Corp., 191 Misc 709, supra; Curry v Norwood Elec. Light & Power Co., 125 Misc 279; Town of North Hempstead v Public Serv. Corp., 107 Misc 19.)
*135 The electricity provided by Con Ed has become an absolute necessity for the entire population of the City of New York, which relies on power for the delivery of all essential services, including water, sanitation, light, heat and transportation. In other words: "[u]tility service is a necessity of modern life; indeed, the discontinuance of water or heating for even short periods of time may threaten health and safety” (Memphis Light, Gas & Water Div. v Craft, 436 US 1, 18, supra). The Supreme Court of the United States consequently held (p 12) that, under Tennessee law which draws a line between utility bills that are the subject of a bona fide dispute and those that are not, where a utility terminated electrical service at will rather than for cause, the aggrieved customers "assert[ed] a 'legitimate claim of entitlement’ within the protection of the Due Process Clause”.
New York courts have similarly been sensitive to the changing needs of an urban society to the extent that they have changed the law to conform to those changing needs (see, e.g., Straus & Co. v Canadian Pacific Ry. Co., 254 NY 407; Tonetti v Penati, 48 AD2d 25; Amanuensis, Ltd. v Brown, 65 Misc 2d 15).
The damages suffered by these plaintiffs represent microscopically the large scale devastation suffered by New York City during the 1977 blackout. Urban residents are more vulnerable than their rural neighbors because they cannot go to a well or stream for an alternate water supply, they cannot dig a hole in the ground as an alternate sanitary safeguard and most cannot resort to firewood for an alternate source of heat and light.
Not only does Con Ed hold itself out as willing to perform its service for any member of the public, but it also possesses an absolute monopoly over the supply of electricity, limited only to the extent that it cannot refuse to provide that service (Transportation Corporations Law, § 12) and that its services must meet the broad standards enunciated in the Public Service Law.
Despite the fact that Con Ed is regulated, it maintains a superior bargaining position in relation to members of the public who seek its services. Defendant files its tariffs with the PSC, which then may or may not reject a given tariff as it sees fit (Public Service Law, § 66, subd 12; 16 NYCRR 136.5). However, the individual member of the public contracting for *136 power is charged with knowledge of the tariff, is bound by its terms, and cannot alter those provisions (Pennsylvania R. R. Co. v International Coal Co., 230 US 184, 197, supra). Despite the fact that the tariff is available for examination, it is the rare customer who knows in advance that the utility company has exempted itself from liability for negligence (Santoro v Central N. Y. Power Corp., 189 Misc 567, 569). If the tariff is improper or illegal, the only remedy open to an individual consumer is resort to the courts, as in the instant cases.
In the case of the Con Ed tariff, the consumer is confronted with a contract of adhesion which makes no provision whereby a purchaser may buy additional protection against negligence (Danna v Con Edison Co., 71 Misc 2d 1029). Were such additional protection available, the evils of an adhesion contract would be vitiated because the bargaining positions of the parties would be equalized in a manner approved by our courts. In Weld v Postal Tel.-Cable Co. (199 NY 88, supra), the Court of Appeals held that a telegraph company could exempt itself from liability for ordinary negligence which occurs in the course of sending messages at the regular rate because the sender had the option to purchase greater protection, up to and including insurance protection for an improperly transmitted message. Weld is relied upon by defendant, and has been cited in a number of lower court cases to sustain the validity of exculpatory clauses (see, e.g., Abraham v New York Tel. Co., 85 Misc 2d 677, supra; Held v New York Tel Co., 73 Misc 2d 582; Warren v New York Tel. Co., 67 Misc 2d 348; Mortenson v New York Tel. Co., 179 Misc 289). However, the significance of Weld is better understood by an examination of the second Weld opinion (210 NY 59, 78, supra), where the court held "The conclusions reached in this case do not tend to subject the public to the mercy of a telegraph company. While such a corporation is invested with certain privileges to be exercised by it for the public benefit, its liability must be measured by reasonable limitations. The opportunity is afforded to one doing business with it to protect himself from danger incident to error likely to arise. A failure to exercise the privilege extended at a small expense may result in a loss which might have been obviated by the injured party in the first instance.” In other words, the message sender had the choice to purchase greater responsibility; the fact that he was effectively left remediless was the result of his own conscious waiver of his right to purchase greater protection and not *137 because the company had unilaterally exempted itself from all liability for negligence. On the same theory, a railroad’s exemption from negligence was enforced where the railroad offered a full price ticket with complete protection and a reduced price ticket with no protection (Anderson v Erie R. R. Co., 223 NY 277; cf. Lebron v New York City Tr. Auth., 44 NY2d 782; Restatement, Contracts, § 575, subd [1], par [b]; subd [2]), while an airline’s attempt to limit its liability for negligence by terms printed on the purchased ticket without offering various rates with corresponding degrees of liability was held invalid (Conklin v Canadian-Colonial Airways, 266 NY 244). Another exception was recognized in Hamilton Employment Serv. v New York Tel. Co. (253 NY 468, supra), where the telephone company was charged with negligence in the preparation of its directories. Although in Hamilton the defendant offered its customers no choice of rates for listing in the telephone directory, the Court of Appeals upheld the exemption from liability on the ground that the activity involved was only a subordinate function of the public service corporation (Hamilton Employment Serv. v New York Tel. Co., supra, p 471; see, also, Santa Fe Ry. v Grant Bros., 228 US 177, 184-188). The decision then added as an analogy (p 471) that "[c]ourts do not hold a carrier to the same degree of liability for mistakes in time tables as for negligence in operation of trains”. Thus, Hamilton does not depart from Weld, which involved the primary function of a telegraph company and a choice of rates.
Con Ed argues that the voiding of its exculpatory clause would make it an insurer, yet plaintiffs do not ask that defendant be held strictly liable as if it were a common carrier (see Rosenstein v Vogemann, 184 NY 325; Transportation Law, §§ 111, 174). In addition, the Court of Appeals has not attached significant importance to the different standard of liability imposed upon common carriers in its opinions concerning exculpatory provisions (cf. Weld v Postal Tel.-Cable Co., 199 NY 88, 98, supra). The focus, whether the particular case involved a telegraph company or an airline, has been the presence or absence of the "element of choice” (Conklin v Canadian-Colonial Airways, 266 NY 244, 248, supra).
The final criterion posed by Tunkl is whether a consumer is subjected to the "risk of carelessness by the seller or his agents” (Tunkl v Regents of Univ. of Cal., 60 Cal 2d 92, 101, supra). A public utility must have an incentive to be conscien *138 tious and customer-oriented (cf. Rogow v United States 173 F Supp 547, 551; Bing v Thunig, 2 NY2d 656, 666-667, supra), and the Public Service Law mandates that a power company provide service which is "safe and adequate” (Public Service Law, § 65, subd 1). Such a statutory requirement is not met by acceptance of a standard of performance which requires only slight care, the measure of care required to avoid liability for gross negligence (see Weld v Postal Tel.-Cable Co., 210 NY 59, 72, supra). While the word "safe” is not an absolute term imposing a duty to insure (New York City Housing Auth. v Medlin, 57 Misc 2d 145, 148, affd 64 Misc 2d 857), it has been stated that safe means " 'untouched by danger’ ” or " 'not exposing to danger’ ” (Jackson v City of St. Louis, 422 SW2d 45, 49; see, also, Words and Phrases, "Safe”). A standard of care which requires only slight care permits that level of carelessness which existed in defendant’s planning and maintenance on the eve of the blackout and led to such catastrophic results. A "utility’s customers should not bear the cost of inefficient management or poor planning” (Matter of St. Lawrence Gas. Co. v Public Serv. Comm. of State of N. Y, 42 NY2d 461, 465). To avoid that exposure, a utility must be held to a standard of reasonable care. For all the foregoing reasons, the exculpatory clause in Con Ed’s tariff is against public policy.
Accordingly, and with the exception of the wage earners, plaintiffs shall have judgments in the sums determined at the trials to be their respective damages.